

EㅏㅑA

RECEIVED

UNITED STATES DISTRICT COURT

APR 2 7 2016

FOR THE NORTHERN DISTRICT OF ILLINOIS

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

EASTERN DIVISION

| | | |
|---|---|---|
| Joseph Bagdonas, | ) | |
| **Plaintiff,** | ) | |
| | ) | **AMOUNT CLAIMED;** |
| **vs.** | ) | |
| Bill Flapan, Ed Zeman, | ) | $30,000,000 |
| Sherry Saxton, Laura Napoles, | ) | |
| Carl Jones ('Jay'), Zeman Homes, | ) | 1:16-cv-04718<br>Judge Thomas M. Durkin |
| Blackhawk Estates, | ) | Magistrate Judge Sheila M. Finnegan |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff charges the Defendants with the illegal confiscation, theft, withholding, extortion, probable 'profiteering', racketeering, and/or ultimate destruction of Federally protected, copyrighted materials, and all the intellectual property of the Plaintiff, Joseph Bagdonas.

1

Then, the Defendants further proceeded in the theft of all the other Plaintiff's personal property, then with a bulldozer, completely demolished the Plaintiff's home.

The Plaintiff is seeking compensatory, as well as punitive damages against the Defendents.

The Plaintiff also charges the Defendents with 'Employment Discrimination', and violations of the Americans with Disability Act, (ADA).

The Plaintiff also charges the Defendants with 'Extortion'! Plaintiff had received a letter from Defendant Sherry Saxton, (a manager/supervisor representing Defendant Ed Zeman), so stating that the Plaintiff would be allowed to enter his home and retrieve personal property, 'IF' the Plaintiff signed a 'release' agreeing not to file any lawsuit against the Defendants, and agreeing to sign the title of his home over to her, (personally).

At that time, maintenance personal, Defendant Laura Napoles and Sherry Saxton had been 'freely' entering the Plaintiff's home and 'steeling' his personal property. Plaintiff was 'not' going to be allowed to enter his own home and discover what personal property was even left in the home. And the Defendant 'refused' to disclose how much time the Paintiff would even have to remove what was even left in his home.

Managers and supervisoring personal gave no guarantees to the Plaintiff, as to the security, safety, or current presence, of any of his personal property.

Then, the Plaintiff estimated that his home was worth in excess of $25,000. And the Defendant expected the Plaintiff to simply sign the title over to the Defendant, so she could 'personally' profit from it.

The Defendant had threatened the Plaintiff with the distruction of his home, 'IF' that release was not signed. This clearly falls under every definition of, 'Extortion'! And was a 'very common' practice there.

2

The Plaintiff refused to sign such a release under those terms, and the Defendants removed the remaining personal property from the Plaintiff's home, then ordered maintenance personal to 'distroy' the Plaintiff's home with a bulldozer.

Plaintiff had been a well published, photographer and writer, as well as a designer, engineer, architect, builder, inventor, an artist, a published poet, and musician.

A 'dispute' had arose between the Plaintiff and Defendants, when Defendant Ed Zeman had reportedly acquired the property known as 400 West Touhy, Des Plaines, IL, 60018, an reported estimate worth of $40 million dollars, for a documented sum, of '$1.00', from the previous owner, Bill Flapan.

Obvious millionaires / billionaires doing what they do, playing their little paper games, to become even richer, while cheating the government.

The property is further described as a mobile home park that occupied approximately 14 acres of land in unincorporated Cook County, Illinois, and only had a Des Plaines mailing address.

And further, had approximately 450 to 500 lots for the placement of mobile, or manufactured homes.

The Plaintiff had resided at that address, and on the site known as Lot #456, since 1987, and resided there for nearly half of his 'entire life'.

In 1992 Plaintiff suffered a back injury, and in 1993 had gone through an extensive back surgery in 1993. The surgery failed, and the Plaintiff had then become totally and permanently disabled.

The Plaintiff eventually only had a fixed disability income to survive upon.

At some point in time, (the exact year now unknown), the Plaintiff and then owner, Bill Flapan made an agreement, that the Plaintiff would received $50.00 off the usual lot rent

3

charged, for helping to, 'keep an eye', on the property, as well as any activities on the property. That included activities of the maintenance employees that worked there.

It was around 2006 that the Plaintiff had gone to then owner, Bill Flapan, discussed the fixed disability income the Plaintiff had been forced to live on, and the owner's increasing rent costs.

Then owner Bill Flapan had made an verbal, unwritten agreement with the Plaintiff, Joseph Bagdonas to read the newly installed water meters on each home, each month, in exchange for the Plaintiff's monthly lot rent.

At that point, the Plaintiff had then been 'technically' employed by then owner Bill Flapan, and an employee of Touhy Mobile Home Park. The Plaintiff remained in that position for approximately 7 years, until the then owner, Bill Flapan, 'reportedly' sold the property to Ed Zeman.

The Plaintiff generated monthly reports of water usage by each resident, and turn those reports over to Bill Flapan directly, and copies to the maintenance personal.

In time, the Plaintiff had personally 'designed and developed' a software database especially for this work.

Designed specifically for entering and calculating water usage, and generating numerous, various kinds of useful reports.

The software the Plaintiff designed and developed, was based off of the Microsoft Excel program. It was titled, 'Touhy Mobile Home Park Water Usage'.

The program was designed by the Plaintiff, was dedicated and very specific for entering, calculating, and generating reports of water usage.

Through the years, the Plaintiff had spent countless hours of his own time, further improving and refining this program.

4

At all times, through each change, modification, or enhancement, the program was always marked, 'Copyright, Joseph K. Bagdonas'.

This program was retained on the Plaintiff's personal main computer, backed up on Plaintiff's secondary computer, as well as on external hard drives, and what are known as USB 'thumb drives'.

In time, the Plaintiff had acquired, (at his own expense), a handheld, electronic device, (specifically, a Motorola MC 9060, in reality, a handheld computer itself), for manually entering all the water readings, so all the readings could be downloaded from the handheld device, directly into the Plaintiff's personal computer.

This was done by setting the electronic device into a cradle, connected to the Plaintiff's personal computer, and through program applications, transfer all the data collected by the Plaintiff, into all the appropriate data fields in the program developed by the Plaintiff.

This was a better method than using pen and paper, on a form also specifically 'designed and created', (and copyrighted), by the Plaintiff.

The Motorola electronic device also had the Plaintiff's copyrighted program in it.

Besides reading the water meters, the Plaintiff had helped with security within the mobile home park.

With the Plaintiff's long background in electronics, designing, engineering, building and manufacturing, he had often been asked to help with maintenance issues in the mobile home park.

At one point, (and without any extra compensation), the Plaintiff had personally designed, engineered, and personally built, a new control system for pump operation for the mobile home park's 'failing' sewage treatment plant.

Plaintiff also designed and built an emergency motor shut off safety mechanism. Then, with his knowledge and experience, specified a new design for another area in the sewage treatment plant.

The sewage treatment plant was located right next to the Plaintiff's home, was depended on, 'keeping an eye on it', and contacting the property manager if there was a problem with it, (which was frequent).

The Plaintiff was given a key for the padlock that secured the gates to the sewage treatment plant. Plaintiff was also given keys to the 'maintenance barn', and other secured areas of the mobile home park. This would all further fall under the definition of an 'employee'.

The Plaintiff had always had an interest in photography, (even as a young child), using the camera of the time, what's now known as an old box camera.

In 1977, the Plaintiff developed a greater interest in photography, and began acquiring newer Nikon 35mm cameras and lenses.

Over the years, the plaintiff's interest in photography grew to where he was investing in professional grade equipment.

The Plaintiff had more specialized in airshow photography, motor sport photography, and wildlife photography, but did all forms of photography.

The Plaintiff took city skyline photographs, personal photographs, special effects photography using special filters, explored double exposure photography, extreme close-up photography, and just anything the Plaintiff found interesting.

The Plaintiff had a very creative imagination, and an insatiable curiosity of the unknown, and what can be achieved by experimenting with special effects photography, using a collection of various specialized filters, and photography equipment and accessories.

6

For a period in the Plaintiff's life, he was listed as a 'Contributing Editor' in a magazine called 'World Airshow News'.

The Plaintiff had excelled in this field to a point where he was just one, of a very rare few photographers, 'in the world', that was able to do this kind of photography.

The Plaintiff had 5 magazine covers to his credit, 'countless' magazine interior features, featuring both photographs and written articles by the Plaintiff.

The Plaintiff had sold numerous  photographs to a company that reproduced them into 16 x 20 posters, who sold those photographs/posters throughout the world.

And the Plaintiff, (along with the cooperation of the United States Air Force), had self-published a calendar of the United States Air Force Thunderbirds, in 1997, the 50th anniversary of the United States Air Force.

The Plaintiff had requested a 'media 'oriental flight', with the United States Air National Guard / United States Air Force Reserve units, then located at O'Hare Airport.

That request had gone from the local base commander, to his commander in Springfield, Illinois, then to the Pentagon in Washington, DC.

The Plaintiff's background had been checked, and the flight approved. The Plaintiff was escorted aboard a KC-135 refueler, and photographed an 'in-air' refueling mission.

In time, the Plaintiff had unrestricted, 'unlimited access', (with the then General of the base), to go flying with any of the KC-135 crews, and photograph refueling missions.

Between these missions, all the air shows covered, motor sport events, (countless other events), visits to zoos, museums, aquariums, various scenic trips, a trip to China, astronomy photography, creative type photography, then just all the photographs the Plaintiff had taken since he acquire his very first camera, the Plaintiff had taken, and collected some countless, 'tens of thousands' of photographs.

7

The Plaintiff had won awards from some of his photographs, had written articles that had been reproduced and printed in 'various' newspapers and magazines, had won an award for an electronic security design, that he designed and engineered, and was a published poet. In fact while in  grade school, the Plaintiff had won two gold medals for his personal solos, and along with his grade school band, won a silver medal for their performance at the  state  championships. (Those medals and countless highly cherished momentos of the Plaintiff's childhood and past, are *'forever gone'*, stolen by the Defendants.)

The Plaintiff was also actively working on refining one United States Patent Application, while beginning another.

The Plaintiff had retained an attorney to do a 'Patent Search', before submitting a first Patent application. The Plaintiff had applied for a Patent, which in the manner in which it was written, was too similar to other applied Patents, not discovered by the attorney.

The Plaintiff had known that his 'invention' was not like any other invention or for any previously issued Patent. Plaintiff also discovered that he could do his own, 'Patent Search' on the Internet.

The Plaintiff learned that it was only a matter of 'refining' the wording in the Patent Application to show and demonstrate that the Plaintiff's invention was indeed unique, and unlike anything previously invented. This was going to be just the first of a few things, the Plaintiff was planning to Patent.

The Plaintiff had already lost one opportunity to Patent an 'invention' he developed, by photographing the item, and writing an article about the invention, and having that published in a magazine. Plaintiff firmly believes his Patent could had  been worth, 'millions'.

The Plaintiff, (using a special CAD computer program), was also in the middle of designing a home, which was in the Plaintiff's computer files.

To help supplement the Plaintiff's disability income, Plaintiff created and ran a small home based mail order business. That involved designing and creating, (or having created), molds, dies, jigs, special tooling, dedicating a workbench specifically for this, setting up bins, shelving, boxes, packing material, (Plaintiff actually had a 'peanut bag' mounted and hanging from the ceiling for packing and shipping), and all things needed to operate this business.

Included in those 'bins', were instructions, safety tags and other written materials, all copyrighted by the Plaintiff. Then, filling other bins, the Plaintiff maintained an inventory of parts and supplies.

Twice in the Plaintiff's life beyond high school, the Plaintiff had attended other vocational and specialized schooling. All the Plaintiff's books, class notations, and all kinds of other various written materials, including diplomas, degrees, awards, ect., were located in the Plaintiff's home.

The Plaintiff had also, without any computer training, created several web sites, that had been hosted on the 'GoDaddy' web hosting company. All those files were on the Plaintiff's personal computers.

All the Plaintiff's banking, financial, legal, digital and scanned medical records, personal and business contacts, business and personal letters written, e-mails, downloads, many of the Plaintiff's photographs, architectural drawings, much of the Plaintiff's artwork, Patnet drawings, searches, research, and notations, specialized software, basically the Plaintiff's *entire life* was within those computer files. All 'stolen' by the Defendents!

Within the home was a file cabinet, 'filled' with all the Plaintiff's past legal history, and countless other paper documents. Within the home the Plaintiff had all his personal and private medical records. Plaintiff's 'entire medical history', including physician's notations, operative records, medication history, X-Rays, CT scans, and MRI films, and a complete record of Plaintiff's cancer treatments. And including hundreds of pages of documents of the Plaintiff's own research on cancer treatments. All 'stolen' by the Defendents!

Within the home there were videos personally created by the Plaintiff, and as with photographs and other matter, are Federally protected under Federal Copyright laws. Included was a video professionally transfered from 8mm film to video. The 8mm film was of the Plaintiff, the Plaintiff's sister, cousin, mother and father, grandmother and grandfather, taken 'well over' 50 years ago, when the Plaintiff was a young child. There were alao family photographs, taken by all of the Plaintiff's family, then 'intrusted' to the Plaintiff for safe keeping. Highly treasured family mementos, now 'gone forever', stolen by the Defendents!

All the images taken by the Plaintiff are protected by Federal Copyright Laws

All the written articles by the Plaintiff, as well as 'any' other written matter and materials by the Plaintiff, are protected by Federal Copyright Laws.

And all inventions, schematics, drawings, artist renditions, architectural drawings, any other artwork, Patnet drawings, notations, and any other creations of the Plaintiff are protected by Federal Copyright Laws.

The initial 'dispute' first involved one of the employees of the new company, held over from the old company (one of the Defendants, Laura Napoles), 'confiscating' one of the Plaintiff's vehicles, and attempting to hold it as some sort of 'ransom' for disputed rent monies

The particular Defendant, used an excuse that the vehicle was illegally parked, as an excuse to 'confiscate' the vehicle, (and trailer).

The Plaintiff had been told by another employee off the company, (the maintenance supervisor of the new company, and the Plaintiff's new supervisor), that the Plaintiff could leave the vehicle where it was at.

During that same time, the Plaintiff had been going through 'extensive' chemotherapy treatments, and was extremely sick.

Even so, suffering numerous side effects of the chemotherapy treatments, the Plaintiff still went out and read the water meters, as he was 'asked to do' by the new maintenance supervisor, of the new company in January 2013.

The vehicle 'confiscated' was parked on a trailer, and both car and trailer had current Illinois license plates, and Cook County registration. This 'particular' Defendant was attempting to collect rent money that the Plaintiff had already gone out and worked for.

This Defendant had known that the Plaintiff had cancer, and was going through chemotherapy treatments, and purposely, intentionally, and with malice, constantly 'harassed' the Plaintiff.

This Defendant used that fact against the Plaintiff. Well knowing that the Plaintiff was suffering from side effects of the chemotherapy treatments, and was physically unable to move a vehicle on a trailer, even though the Plaintiff was told by a 'supervisor' of the new company, that the vehicle and trailer could remain exactly where it was parked.

The purposeful, 'illegal' harassment of the Plaintiff, (by this particular Defendant, Laura Napoles), had increasingly escalated.

Besides the illegal confiscation of the Plaintiff's vehicle, the Defendant constantly, 'illegally' posted various threatening notices on the Plaintiff's door, in violation of state statutes.

This Defendant continued this harassment by posting a 'sticker' across the doors of one of the Plaintiff's sheds. Then later 'ordered' the maintenance personal to actually 'board up' the door to this same shed, denying the Plaintiff's access to his disability mobility scooter, (along with other personal property), just for her own amusement and purposeful spite.

This particular Defendant had totally ignored state laws and statutes, basically attempting to take the law into her own hands to administrate. Something that was a 'common practice' there, as opposed to turning such issues over to their legal representative.

The Plaintiff had later learned from a trusted source, (the property manager that worked for Bill Flapan), that Defendent Laura Napoles was given specific instructions by

11

Defendent, Bill Flapan, (outgoing owner of the mobile home park), to defame, slander and discredit the Plaintiff, in every and any way possible, with her supervisor, (Sherry Saxon), and the new administration, to insure that he looses his position there, and to, 'distroy his life' in every way possible!

The Plaintiff couldn't wait for this entire issue to be turned over to their legal representative, and into the court system, where the Plaintiff could speak out against this harassment, stop that harassment, and further defend himself.

As it turned out, putting this matter into the hands of their legal representative didn't do much to insure that laws would be properly followed.

Their legal representative was 'very used' to circumventing state laws and statues as well. Through the years, he was very used to dealing with people that were unfamiliar with laws and statutes, were afraid to question anything, or speak up for themselves.

Not to mention, elderly, disabled, and low income people, that were unable to seek out any legal representation of their own. What ever he was able to get away with, was done, whether it followed the law or not.

Even though this property was within the Cook County Third District area, any paperwork would 'always' be filed in the First District, (downtown Chicago, and about one block from his office), where he 'well knew' many people could not get to, to appear for any hearings.

Being privately own property, within unincorporated Cook County, and with very little legislation governing tenants rights, these 'mega-rich' land owners were not unlike little 'dictators', that very easily got away with running such properties like, 'Nazi concentration camps'.

Most people had very large investments in their homes, not unlike any other home, would have a mortgage on that home, but rented the land the homes were set up on.

12

At anytime, at just a 'whim', the owner could tell a resident to move their home off the property. Something that would cost 'many' thousands of dollars to do.

Then, even 'if' a resident had such funds, the home owner would have no place to go with their home. Most mobile home parks will not allow a resident with a 'used' mobile home to move onto their proper

The mobile home park owner will typically not allow someone to sell their home where it was already set up, often with awnings, decks, landscaping, and other home improvements.

The plaintiff had also operated a small mail order type business out of his home, to help supplement his low fixed disability income.

The Plaintiff had never had the opportunity to go to college, but through a vocational rehabilitation program, and 'all' paid by the government, the Plaintiff was able to attend, as obtain a certificate from a then well known, electronics school.

All the Plaintiff's school books, reference material, notations, formulas, just 'everything' that made the Plaintiff a certified 'Electronics Technician', including the Plaintiff's diploma, was confiscated, stolen and most likely destroyed by the Defendants.

Later in life, (after that disabling back injury, and failed back surgery), the Plaintiff had to find 'some way' to supplement his disability income. After examining some possibilities of what was even physically possible to due, after such a back surgery.

The Plaintiff, at his own expense, traveled to Florida, paid all the tution, fees, books, lab and all other fees, attended a school and gained a certificate as a 'Certified Colon Hydrotherapist'.

Even receiving his certification, the Plaintiff held off on that opportunity to supplement his income, for another opportunity to start up a small mail order business out of his home.

All supplies, inventory, special tooling, customer / dealer information, just 'everything' that kept the Plaintiff in business was also in the Plaintiff's home, and was confiscated, withheld, and most likely sold for profits, or destroyed by the Defendants.

All the Plaintiff's 'personal and private' medical information and records, including all imaging films, reports and other documentation, was stolen, (and most likely inspected and viewed), by the Defendants.

All of the Plaintiff's 'personal and private', legal documentation and records, spanning countless years, was stolen by the Defendants.Including several 'extremely important' documents, where there are no copies, no possible ways to recover,or have duplicated.

And especially including 'all' documents pertaining to the ongoing legal actions, between the Plaintiff and Defendants.

That also included all strategy of the Plaintiff, 'and evidence', the Plaintiff had spent 'countless hours', researching, discovering, and documented, that would had been used against the Defendants in the pending action against the Plaintiff, then in a separate civil action against the Defendants.

The Defendants went into the Plaintiff's home and confiscated particular evidence and documents that the Plaintiff discovered and uncovered, and destroyed it, so the Plaintiff could not expose 'extremely serious' violations of the Enviromental Protection Act, by the land owners.

The Plaintiff *'firmly believes'* that the cancer he contracted, was a result of living on that property nearly half his life, drinking known contaminated water, subject to fumes of, and the very close proximity to the mobile home park's aged, failing sewage treatment plant, and the frequent spilling of raw sewage.

There was also an occassion when contaminated soil had 'purposedly' been buried within 'inches' of the Plaintiff's lot, (yard, that he had to maintain), and approximately 20 feet from the Plaintiff's front door.

The Defendants had confiscated, destroyed, or sold, 'once in a lifetime' photographs taken by the Plaintiff, that can never, ever be reproduced again!

The Defendants can be, 'to this very day', (as well as in the future), be 'profiting from' the use, sale, or other explotion of the Plaintiff's photographs, inventions, Patent documents, writings, poetry, drawings, schematics, architectural drawings, or 'any' other creation, 'or property' of the Plaintiff, including personal property of the Plaintiff.

Defedents can, to this day, even be using Plaintff's 'personal property' for their employment, profession, and other monetary gains.

The Defendants, out of 'pure greed', had *'forever'* deprived, and denied, the Plaintiff from ever again earning any income from his photographs, his Patent ambitions, inventions, artwork, writings, poetry, architectural drawings, any other creation, or property, for the rest of his life!

The Defendants out of shear 'lust for power', had taken away 'everything' the Plaintiff was, everything he had ever accomplished in his entire life, his 'entire history', his entire future, and 'nearly' his entire identity....

The Plaintiff, and his two cats, remains 'homeless' to this day.

_____

Joseph Bagdonas, Plaintiff

## SUPPLEMENTAL NOTE FROM THE PLAINTIFF;

The Plantiff apoligizes to ths Court in the, manner in which this Complaint is presented. The Plaintiff is planning on requesting an Appointment of Council in this matter, and well knows that an Amended Complaint will no doubtfully need to be drafted, in a matter more suitable to this Court.

The Plaintiff has a factual story to tell, and did so in the best manner he could, given the circumstances. The Plaintiff is suffering from numerous permanent side effects of a very aggressive chemotherapy regimen from the cancer contracted, which affects his concentration, long and short term memory, hearing loss, suffers from confusion, lack of a sence of time, and cognitive skills.

Since all the Plaintiff's computers, printers, drives, (and other accessories), had been "stolen" by the Defendents, the Plaintiff was forced to type out this entire Complaint on a, 'cell phone keyboard'. Plaintiff was only able to type out these these 'facts', a little at a time, over along period of time, because of the mental anguish and torment of being forced into homelessness, and the distress and mental torture of being victimized of 'so many' criminal acts, committed by the Defendents. And what had been done to the Plaintiff, can only be described as, *'criminal'*.

And all during this, the Plaintiff was in 'Stage 4 Cancer', trying to fight for his life, going through 'extremely intense' chemotherapy treatments, that in itself nearly killed him. Chemotherapy treatments that's future effects are 'still' unknown, including other cancers caused by the chemotherapy itself.

The Plaintiff has had to seek out professional help to try and deal with the severe depression, chronic fatigue, sleep disorder, nightmares, and other issues, that was forced upon the Plaintiff, by the actions of the Defendents. It may very well be diagonsed that the Plaintiff is suffering from 'Post Traumatic Stress Disorder", 'because of', the criminal actions of the Defendents!